UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------ X
ANTHONY ARRIAGA,                 :

              Petitioner,      :

   -against-                     :

WARDEN,                          :
Sing Sing Correctional           :
Facility,                        :
                                   No. 13 Civ. 6060
ATTORNEY GENERAL,                :
State of New York,               :            **OPINION & ORDER**

and                              :

DISTRICT ATTORNEY,               :
Bronx County,                    :

              Respondents.     :
------------------------------ X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 07/11/2016 |

APPEARANCES
FOR PETITIONER ANTHONY ARRIAGA
    Cheryl J. Sturm, Esq.

FOR RESPONDENTS WARDEN, Sing Sing Correctional Facility,
ATTORNEY GENERAL, State of New York, AND DISTRICT ATTORNEY,
Bronx County
    Kayonia L. Whetstone, Esq.
    Rafael A. Curbelo, Esq.
    BRONX DISTRICT ATTORNEY'S OFFICE

**JOHN F. KEENAN, United States District Judge:**

    Before the Court is Anthony Arriaga's ("Arriaga") petition

for habeas corpus under 28 U.S.C. § 2254.

    On November 15, 2005, a Bronx County, New York jury

returned a verdict convicting Arriaga of second-degree murder of

Steven Wenner ("Wenner").  On January 19, 2006, the state trial

court (Farber, J.) rendered judgment and sentenced Arriaga to a prison term of twenty-five years to life.  On December 1, 2011, the New York Appellate Division, First Department, unanimously affirmed Arriaga's conviction, and the New York Court of Appeals denied Arriaga's application for leave to appeal in June 2012.

While awaiting decision on his direct appeal, on July 31, 2007, Arriaga, acting pro se, filed a motion to vacate his conviction under New York Criminal Procedure Law § 440.10. Arriaga claimed two grounds of relief:  ineffective assistance of trial counsel and prosecutorial misconduct.  On January 7, 2008, the New York Supreme Court denied the motion without holding an evidentiary hearing.  On February 1, 2008, and March 3, 2008, the New York Supreme Court denied motions for leave to reargue the section 440.10 motion.  On April 4, 2008, the New York Appellate Division, First Department, denied leave to file an appeal from the denial of his section 440.10 motion.

Arriaga filed the instant petition for federal habeas corpus on August 27, 2013.  He raises three grounds for granting his application:  (1) the State obtained his conviction in violation of his Sixth Amendment right to effective assistance of counsel; (2) the State obtained his conviction in violation of his Fourteenth Amendment right to due process of law; and (3) the State obtained his conviction with insufficient evidence of guilt.  To overcome the procedural bar to his second ground

2

for granting habeas corpus, Arriaga also asserts a gateway claim
of actual innocence.   This Court denies Arriaga's petition.

## I.  Background

### A.  The People's Case

The People called one eyewitness in Arriaga's case,
Emmanuel Borras ("Borras") who testified to the following:

On the afternoon of May 7, 2003, the deceased, Wenner, and
Borras sat on the top of the stairs leading down to their
basement apartment located at 592 Morris Park Avenue in Bronx,
New York. (Trial Tr. 205, Nov. 7, 2005 (testimony of Emmanuel
Borras).)  Wenner and Borras watched Arriaga walking down the
sidewalk and believed Arriaga was staring Wenner down. (Id.)

Later that evening, Wenner and Borras decided to walk to
the corner grocery. (Id. at 206, 214, 232.)  Wenner and Borras
encountered Arriaga a second time, talking to a man that Wenner
knew as "Biggy" and an unknown woman. (Id.)  Wenner approached
Biggy and, after greeting him, asked Biggy if he and Arriaga
were friends. (Id. at 214.)  Biggy said that they were.  Wenner
responded, "I guess this guy has a problem with me, he keeps
staring me down." (Id.)  Wenner then approached Arriaga and
asked, "Do you have a problem?" (Id.)  Arriaga claimed that he
was only staring at Wenner because he thought he knew him from
somewhere. (Id.)  Wenner told Arriaga that Arriaga was mistaken.
(Id.)  Arriaga said he was "going to call [his] boys," and

3

reached for his cell phone. (Id.)  When he could not get a hold of his friends, Arriaga told Wenner, "I will be back." (Id.)

Still later that evening, around 11:00 p.m., Borras and Wenner were in their apartment. (Id. at 215.)  Borras was playing video games, when Wenner stepped outside to retrieve a chair. (Id.)  Borras then heard the sound of a gunshot. (Id. at 216.)  Borras turned to find a visibly frightened Wenner shouting, "He came back, he is shooting at me." (Id. at 208.)  Borras saw Arriaga standing near the top of the staircase leading to their apartment pointing a gun downwards into the apartment. (Id. at 208-09, 217.)  Wenner and Borras, under continued gunfire, fled from the doorway towards the bedroom where Wenner's young son slept.  By this time, Wenner was bleeding profusely.  He told Borras, "I think I am going to die, just grab my son," and turned back towards the front door. (Id. at 217.)  Wenner shouted, "Why the fuck are you shooting at me?" (Id. at 218.)  Borras checked on Wenner's son and returned to find Wenner lying face down on the staircase. (Id.)

The People also presented several law enforcement witnesses.  Police Officers Spoelstra and DeFalco arrived at the scene at approximately 11:03 p.m., responding to a report of shots fired. (Id. at 50 (testimony of Officer Spoelstra).)  Borras, visibly upset, met Officers Spoelstra and DeFalco and demanded they do their job. (Id. at 50, 53.)  Officer Spoelstra

4

observed Wenner lying face down on the staircase and called for
an ambulance. (Id. at 54.)  The officers found six .9 mm shell
casings on the top of the staircase leading to the apartment, a
deformed bullet in the living room of the apartment, and four
unspent shell casings four or five houses from the crime scene.
All rounds were fired from the same gun. (Id. at 58-59; id. at
539, Nov. 10, 2005 (testimony of Detective Barry).)  Officer
DeFalco pulled Borras aside for questioning, but Borras provided
minimal detail, stating that he heard shots but did not see the
shooter. (Id. at 53, 101, Nov. 7, 2005 (testimony of Officer
Spoelstra).)

The following day, Detectives Ralph Argiento and Kevin
Tracy interviewed Borras at the precinct house. (Id. at 449-50,
Nov. 10, 2005 (testimony of Detective Argiento).)  Borras
provided a more detailed account of the shooting at that time.
Detective Tracy took a statement during the interview, which he
described at trial as a "loose interpretation of what [Borras]
actually told me." (Id. at 698, Nov. 15, 2005 (testimony of
Detective Tracy).)  Borras' trial testimony was inconsistent
with Tracy's version in a number of respects and Borras
disavowed much of the Tracy account's content during his
testimony. (Id. at 253, Nov. 7, 2005 (testimony of Emmanuel
Borras).)  Of particular interest, Tracy's statement recounts
that Borras observed Arriaga shooting from the "bottom of the

5

stairs," a detail that Borras disavowed during his testimony. (Id.)

It is not entirely clear from the record how Arriaga became a suspect.  On May 22, 2003, however, Detectives Argiento and Tracy arrested Arriaga at the home of a friend, where he had been staying since he learned that the police were looking for him. (Id. at 395-97, Nov. 10, 2005 (testimony of Detective Argiento).)  The detectives found a piece of paper among the items in Arriaga's possession on which Arriaga had written a name and address ("Candice Lugo, 1701 Garfield Street, Bronx, New York 10460"); a list ("clippers . . . Yohimber, Metro Card, role [sic] of quarters, new location, and in parentheses . . . 'NOW.'"); and a name and instruction ("David Chhea" and "sign in attendance sheet for the day of incident, what time class started"). (Id. at 743-44, Nov. 15, 2005 (testimony of Detective Tracy).)

The detectives brought Arriaga to the 49th precinct house where they mirandized him and informed him that they were detaining him for the murder of Wenner.  Arriaga replied that "he would give information on the events if he knew what kind of numbers he was looking at," which the detectives understood to mean that Arriaga was looking for "some assurance of how much time he was going to get." (Id. at 746-47; id. at 399, Nov. 10, 2005 (testimony of Detective Argiento).)  That same day, Borras,

6

sixteen days after the murder, immediately identified Arriaga in
a line-up, stating, "That's the one that killed my fucking
friend." (Id. at 241-42, Nov. 7, 2005 (testimony of Emmanuel
Borras).)  Borras again identified Arriaga as Wenner's shooter
at trial. (Id. at 210-11.)

### B.  The Defense

Arriaga called two alibi witnesses:  his mother, Miriam
Casillas ("Casillas"), and his sister, Kim Maldonado
("Maldonado").  Prior to May 14, 2003, when Arriaga learned that
the police were looking for him and began staying with the
family friend in whose home he was arrested, Arriaga lived in an
apartment with his mother. (Id. at 584, 601-03, 618-19, Nov. 10,
2005 (testimony of Miriam Casillas).)  Casillas and Maldonado
testified to the same basic facts. (Compare id. 582-632, with
id. 633-654 (testimony of Kim Maldonado).)  On May 7, 2003,
Casillas attended the funeral of her daughter's grandmother.
Arriaga did not accompany her because he stayed home to care for
a sick uncle. (Id. at 585 (testimony of Miriam Casillas).)
Casillas returned home at 4:00 p.m. so that Arriaga could attend
a class taught by David Chhea from 6:00 p.m. to 9:00 p.m. at
Bronx Community College. (Id. at 587-88.)  Casillas testified
that petitioner left for class at 4:30 p.m. and returned at
approximately 10:00 p.m. (Id. at 588-89.)  Casillas testified
that Arriaga remained at home until at least 11:30 p.m., when

Casillas went to bed. (Id. at 589-90.)  On cross-examination,
Casillas admitted to having little contact with Arriaga during
the day, but claimed that he returned home at 10:00 p.m. because
it was his routine. (Id. at 621, 625.)

Arriaga placed in evidence an attendance sheet from a class
that the parties stipulated was taught by David Chhea.  The
attendance sheet showed the following:  (1) the course started
on March 24, 2003, and ended on June 16, 2003; (2) Arriaga was
absent the entire month of April; (3) Arriaga was present
beginning in May including May 7, 2003, the evening of the
incident. (Id. at 917-19, Nov. 16, 2005 (People's summation).)
Arriaga did not produce any information about who filled out the
attendance sheet (i.e., David Chhea or the students) or who
could access it. (Id. at 827-832 (proceedings and court's charge
on stipulation).)

Arriaga also called Detective Kevin Tracy.  Detective Tracy
testified that when he took Borras' statement on the morning of
May 8, 2013, Borras had been at the precinct house for quite
some time and wanted to leave. (Id. at 692, Nov. 15, 2005
(testimony of Detective Tracy).)  Borras was anxious, angry, and
upset that his friend had been killed. (Id.)  Tracy's statement
included the following statements attributed to Borras:
(1) "probably around 7:30 p.m. this Puerto Rican kid comes
walking down the street headed towards Van Nest Avenue;"

(2) "about an hour or so later, me and Steven take a walk down to Van Nest Avenue to get some things from the corner store;" (3) "Steven . . . comes running into the apartment and he's saying they shooting at me;" and (4) "as Steven runs past me, I look outside the apartment and see the same Puerto Rican kid Steve was arguing with earlier, standing at the bottom of the stairs that lead to the apartment, with gun in his hand." (Id. at 696-700.)  While Detective Tracy characterized this statement as a "loose interpretation of what [Borras] actually told me," he testified that he either read the statement to Borras or that Borras read the statement himself before he signed it. (Id. at 693, 695, 698.)

### C.  Procedural History

#### 1.  The Outcome of the Trial

On November 18, 2005, the jury returned a verdict of guilty on the charge of murder in the second degree, N.Y. PENAL LAW § 125.25[1].  On January 19, 2006, the New York Supreme Court rendered judgment convicting Arriaga after a jury trial of murder in the second degree and sentencing him to an indeterminate term of imprisonment from twenty-five years to life.

#### 2.  Arriaga's Direct Appeal

On December 1, 2011, the New York Appellate Division, First Department, unanimously affirmed Arriaga's conviction, People v.

Arriaga, 90 A.D.3d 416 (1st Dep't 2011).  Arriaga, through his
counsel, argued that his conviction required reversal because
(1) there was insufficient evidence to establish guilt beyond a
reasonable doubt, or, alternatively, the verdict was against the
weight of the evidence, and (2) the prosecution's summation
denied Arriaga his constitutional right to a fair trial. (Aff.
of Kayonia L. Whetstone Ex. 8 [hereinafter Whetstone Aff.].)
Arriaga filed a pro se supplemental brief that argued that his
defense counsel (1) failed to promptly investigate his alibi;
(2) failed to conduct an independent investigation of the crime
scene; and (3) failed to request reopening of the Wade hearing
when "pertinent facts arose during trial suggesting that [the]
photo array emanated from an anonymous tip and not from the
People's only eyewitness." (Id. Ex. 9.)  Arriaga's pro se
supplemental brief also argued that the prosecutor's failure to
correct the sole eyewitness' false material testimony violated
his rights to due process and a fair trial. (Id.)

     The Appellate Division concluded that the verdict was based
on legally sufficient evidence and was not against the weight of
evidence. Arriaga, 90 A.D.3d at 416.  It held that no basis
existed for disturbing the jury's determinations of
identification and credibility, including its evaluation of
alleged inconsistencies in testimony. Id.

The Appellate Division also held Arriaga's challenges to the summation to be procedurally barred as unpreserved and, alternatively, that no basis for reversal existed because, to the extent the summation contained any improprieties, the trial court's curative actions sufficiently prevented any prejudice. Id.

Finally, it held Arriaga's ineffective assistance of counsel claim unreviewable because it was based on matters outside the record concerning counsel's preparation and strategy. (Id.) "To the extent the existing record permits review, [the Appellate Division held] that defendant received effective assistance under the state and federal standards." (Id. (citing Strickland v. Washington, 466 U.S. 668 (1984); People v. Benevento, 91 N.Y.2d 708, 713-714 (1998)).

On June 21, 2012, the New York Court of Appeals denied Arriaga's application for leave to appeal. People v. Arriaga, 19 N.Y.3d 957 (2012).

### 3.  Arriaga's Exhaustion of State Remedies

While awaiting decision on his direct appeal, on July 31, 2007, Arriaga, acting pro se, filed a motion to vacate his conviction under New York Criminal Procedure Law § 440.10. Arriaga claimed two grounds of relief:  ineffective assistance of trial counsel and prosecutorial misconduct.

11

### a.  Arriaga's Initial Section 440.10 Motion

Arriaga's ineffective assistance claim arose from his argument that Borras could not have physically observed the shooter from his position in the apartment.  To support this argument, Arriaga attached a DVD of an unidentified apartment and a staircase outside the front door.  Arriaga argued that his counsel denied him effective assistance by failing to explore, through independent investigation of the crime scene, Borras' alleged physical inability to witness the shooter from his position in the apartment.

Arriaga's prosecutorial misconduct claim asserted that the prosecutor had suborned perjury by allowing Borras to testify falsely and failing to correct his false testimony.

On January 7, 2008, the New York Supreme Court (Martin, J.) denied the motion without holding an evidentiary hearing.  In New York, a defendant must prove ineffective assistance of counsel by demonstrating that his counsel did not afford him "meaningful representation" and "'the absence of strategic or other legitimate explanations' for counsel's allegedly deficient conduct." People v. Caban, 5 N.Y.3d 143, 152 (2005) (quoting People v. Rivera, 71 N.Y.2d 705, 709 (1988)).  The court, applying this standard, ruled that Arriaga did not establish ineffective assistance of counsel because

> the witnesses' [sic] ability to observe who
> shot the deceased was thoroughly questioned by
> [the] defense attorney and argued during
> summation.   In addition, a <u>Wade</u> hearing
> (actually a <u>Huntley</u>/<u>Wade</u>/<u>Mapp</u> hearing) was
> conducted on October 24-25, 2005 after which
> Judge Farber held that the witness'
> identification of defendant was not improperly
> suggestive.

(Whetstone Aff. Ex. 2, at 3.)  The court also rejected Arriaga's

prosecutorial misconduct argument, citing three grounds.  First,

the court rejected Arriaga's argument as procedurally barred

because he could argue prosecutorial misconduct on direct appeal

but had "failed, to date, to perfect his appeal".[1] (<u>Id.</u> at 4

(citing N.Y. CRIM. PROC. LAW § 440.10(2)(c)).)  Second, in its view

addressing the merits, the court rejected Arriaga's

prosecutorial misconduct argument because it was not based upon

sworn allegations as required by New York Criminal Procedure Law

§ 440.30(4)(b), but instead upon Arriaga's unsupported claim.

(<u>Id.</u>)  Finally, Arriaga failed to submit an affidavit from

either of his trial counsel. (<u>Id.</u>)

### b.  Arriaga's First Request for Reargument

On January 9, 2008, presumably prior to receiving the

court's January 7, 2008 opinion, Arriaga submitted a motion to

file a supplemental pleading appending an affidavit from retired

---

[1]  As noted above, the Appellate Division, in its 2011 decision,
considered and denied Arriaga's challenges to the summation as
unpreserved and, alternatively, as cured by the trial judge's
jury instructions. <u>See</u> <u>People v. Arriaga</u>, 90 A.D.3d at 416.

N.Y.P.D. detective and private investigator John Barna.  Barna's affidavit states that "a visit was made" to Wenner's apartment and that photos and video taken there "indicate that to be able to observe the top of the stairway leading to the sidewalk, the observer would have to be standing in the doorway of the apartment.  The further one moves back into the apartment the less and less of the stairway is visible." (Id. Ex. 3 (Aff. of John Barna) ¶¶ 4-6.)

On February 1, 2008, construing Arriaga's January 9 letter as a motion to reargue, the New York Supreme Court again denied Arriaga's section 440.10 motion stating that the new facts did not change its decision. (Id. Ex. 4.)

### c.  Arriaga's Second Request for Reargument

After retaining new counsel, Murray Richman, Esq., Arriaga again moved for reargument of his section 440.10 motion on February 5, 2008. (Id. Ex. 5.)

On March 3, 2008, the New York Supreme Court again denied Arriaga's motion for leave to reargue the section 440.10 motion, concluding that, "[a]fter taking into consideration affirmations in support of defendant's motion, as well as viewing the video provided by defendant, the Court adheres to its original decision.  Defendant has not presented any additional facts or legal arguments which convince this Court to change its decision." (Id. Ex. 6, at 1.)

14

### d.  Arriaga's Motion for Leave to Appeal from the N.Y. Supreme Court's Opinion

Also on February 5, 2008, Arriaga sought leave to appeal from the N.Y. Supreme Court's opinion from the Appellate Division, First Department. (Id. Ex. 7.)

On April 4, 2008, the New York Appellate Division, First Department, denied leave to file an appeal from the denial of his section 440.10 motion. (Id. ¶ 17.)

### 4.  Arriaga's Federal Habeas Petition

Having exhausted his state remedies, Arriaga filed an application for habeas corpus pursuant to 28 U.S.C. § 2254 on August 27, 2013.  Arriaga asserts three grounds for granting his application:  (1) the State obtained his conviction in violation of his Sixth Amendment right to effective assistance of counsel; (2) the State obtained his conviction in violation of his Fourteenth Amendment right to due process of law; and (3) the State obtained his conviction with insufficient evidence of guilt.  To overcome the procedural bar to his second ground for granting habeas corpus, Arriaga also asserts a gateway claim of actual innocence.

## II.  Applicable Law

Section 2254 permits a district court to entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court "only on the

ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Absent certain exceptions, a habeas petition based on a state court conviction shall not be granted "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." Id. § 2254(b)(1)(A).  In respect of claims adjudicated on the merits in those state court proceedings, a district court may only grant a habeas petition on two grounds. First, if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1).  Second, if the state court's adjudication "resulted in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2).

The first ground for habeas relief, set forth in subparagraph (d)(1), contains two separate clauses:  "contrary to" and "unreasonable application." Id. § 2254(d)(2).  These two clauses have independent meaning. See Bell v. Cone, 535 U.S. 685, 694 (2002).  A court applying the "contrary to" clause asks whether the state court identified the correct governing legal principle and whether the facts of the case before it are in any way distinguishable from Supreme Court precedent. See Williams

v. Taylor, 529 U.S. 362, 405-406 (2000).  If the state court's decision identifies the correct governing legal principle, the court moves to the "unreasonable application" clause and asks if the state court's determination unreasonably applied the correct principle to the facts before it. Id. at 413.  To be considered an "unreasonable application," the state court's determination must be more than merely incorrect or erroneous.  It must, instead, lack justification such that the state court committed error "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

A petitioner seeking habeas relief pursuant to § 2254(d) is limited to proving that the state court's determination was "contrary to" or an "unreasonable application" of existing federal law based only on the record before the state court when it made its determination. See Cullen v. Pinholster, 563 U.S. 170, 185 (2011).

### III.  Discussion

Arriaga challenges his conviction on three grounds.  First, he asserts that his conviction violates the Sixth Amendment because he was denied effective assistance of counsel.  Second, he asserts that his conviction violates the Fourteenth Amendment because he was the victim of prosecutorial misconduct.  Because the state court's decision determined that Arriaga was

procedurally barred from raising this ground, he asserts a gateway claim of actual innocence, which if proven would eliminate the procedural bar.  Finally, Arriaga argues that the State obtained his conviction on insufficient evidence.

### A.   The State Court's Determination of Arriaga's Ineffective Assistance of Counsel Claim Was Not Contrary to or an Unreasonable Application of Federal Law

When a petitioner raises an ineffective assistance of counsel claim in his § 2254 motion, the established federal law for the purposes of § 2254 is Strickland, 466 U.S. 668. See Williams, 529 U.S. at 390-91.  The Strickland Court set forth a two-prong test for evaluating ineffective assistance of counsel claims. See Strickland, 466 U.S. at 687-89.  Under the first prong, the petitioner must show that his counsel's performance fell below an objective standard of reasonableness, measured by prevailing professional norms. Id. at 687-88.  Under the second prong, the petitioner must show that his counsel's deficient performance prejudiced the defense by demonstrating a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 687, 694.  A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Id. at 694.

The state court considered Arriaga's ineffective assistance of counsel claim in two separate opinions.  On direct appeal, the Appellate Division concluded that the claim was mostly

unreviewable because it involved matters outside the record, but "[t]o the extent the existing record permits review, [the Appellate Division held] that defendant received effective assistance under the state and federal standards." Arriaga, 90 A.D.3d at 416 (citing Strickland, 466 U.S. 668; Benevento, 91 N.Y.2d at 713-714).

On Arriaga's section 440.10 motion, the New York Supreme Court decided Arriaga's ineffective assistance claim by reference only to New York's ineffective assistance of counsel standard.  Using only the New York state standard, without more, is not a constitutional violation because "the New York state standard for ineffective assistance of counsel is not contrary to Strickland." Rosario v. Ercole, 601 F.3d 118, 126 (2d Cir. 2010).  Indeed, "New York state courts have repeatedly asserted that the New York standard is, in practice and in intent, more generous to defendants than the federal standard." Id. at 125 (collecting cases).

Because New York's ineffective assistance of counsel standard is not contrary to Strickland, to qualify for relief under § 2254(d)(1), Arriaga must show that the state court unreasonably applied Strickland.  A federal habeas court's "unreasonable application" review is extremely deferential: "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

could disagree' on the correctness of the state court's
decision." See Chrysler v. Guiney, 806 F.3d 104, 118 (2d Cir.
2015) (alteration in original) (quoting Harrington, 562 U.S. at
101).  The Strickland standard is a general rule and "[t]he more
general the rule, the more leeway courts have in reaching
outcomes in case by case determinations." Yarborough v.
Alvarado, 541 U.S. 652, 654 (2004).  Because both the Strickland
standard and § 2254(d)(1)'s "unreasonable application" standard
are highly deferential, "when [they] apply in tandem [the
court's] review must be 'doubly' deferential." Rivas v. Fischer
(Rivas II), 780 F.3d 529, 547 (2d Cir. 2015) (citing Harrington,
562 U.S. at 105).  Consequently, the relevant question for a
federal habeas court tasked with determining whether a state
court unreasonably applied Strickland is:  is there any
reasonable argument that counsel satisfied Strickland's
deferential standard? Id.  Here, the answer is yes.

Arriaga contends that his counsel were ineffective because
(1) they failed to interview a potential alibi witness, "Odam
Chhea, who was one of the three instructors teaching the
Computer Networking Plus Class at Bronx Community College" and
(2) they failed to conduct an independent investigation of the
crime scene (Pet.'s Br. in Support of Pet. for Habeas Corpus
Under § 2254, at 17-18 [hereinafter Br.].)

20

**1.   The State Court Did Not Unreasonably Apply Strickland to Arriaga's Assertion that Counsel Allegedly Failed to Interview a Potential Alibi Witness**

Arriaga introduced the legal theory that his counsel provided ineffective assistance because of their failure to interview a potential alibi witness only on direct appeal in 2011 and not on his section 440.10 motion in 2008.  Because such an argument generally involves evidence extraneous to the trial record, the Appellate Division first summarily rejected all of Arriaga's ineffective assistance arguments on direct appeal as "unreviewable on direct appeal because they generally involve matters outside the record concerning counsel's preparation and strategy," Arriaga, 90 A.D.3d at 416 (citing Rivera, 71 N.Y.2d at 709).  It added, however, that "[t]o the extent the existing record permit[ted] review," Arriaga's claims of ineffective assistance failed under both "the state and federal standards." Arriaga, 90 A.D.3d at 416 (citing Strickland, 466 U.S. 688; Benevento, 91 N.Y.2d at 713-14).

Arriaga's failure to raise this argument in his section 440.10 motion, where the Appellate Division believed he would be able to better develop it does not create any exhaustion concern under § 2254(b), because exhaustion of state remedies "do[es] not mean that there can be no substantial difference in the legal theory advanced to explain an alleged deviation from

constitutional precepts." <u>Daye v. Attorney Gen. of State of</u>
<u>N.Y.</u>, 696 F.2d 186, 192 n.4 (2d Cir. 1982).

This failure merely had the consequence of stripping the
Appellate Division from providing articulated reasoning for its
rejection of Arriaga's claim of ineffective assistance on this
legal theory.  Where, as here, the state court "does not provide
reasons for its decision, [the federal habeas court] examine[s]
'what arguments or theories . . . <u>could</u> have supported' that
decision, and then 'ask[s] whether it is possible fairminded
jurists could disagree that those arguments or theories are
inconsistent with the holding in a prior decision of [the U.S.
Supreme] Court." <u>Chrysler</u>, 806 F.3d at 118 (emphasis in
original) (omission in original) (quoting <u>Harrington</u>, 562 U.S.
at 102).

Here, the Appellate Division could have concluded that
Arriaga's counsel's decision not to interview Odam Chhea was
reasonable in light of the other alibi evidence presented at
trial and the central issue of the prosecution's case.  The
prosecution established that Wenner's murder occurred at 11:00
p.m.  Therefore, Arriaga's case turned on rebutting the
prosecution's evidence that Arriaga was at Wenner and Borras'
apartment at that time.

Arriaga presented two witnesses who testified that, on the
day of the incident, while they attended a funeral, he was home

22

taking care of a sick family member until he left for class at
4:00 p.m.  These witnesses further testified that Arriaga
returned home at 10:00 p.m. and remained home until at least
11:30 p.m.  Thus, for the time period most critical to the
prosecution's case, Arriaga presented two witnesses who
testified that he was at home.

Odam Chhea, who Arriaga asserts taught the class he
attended that evening, would only be able to provide an alibi
for the time Arriaga was allegedly attending his class—from 6:00
p.m. to 9:00 p.m.—a full two hours prior to the time of Wenner's
murder.  Based on this fact alone, the Appellate Division could
have concluded that it was reasonable for Arriaga's counsel to
focus their efforts elsewhere and decide not to interview Odam
Chhea.  Nevertheless, Arriaga admitted into evidence an
attendance sheet that the parties stipulated provided the same
alibi information that Odam Chhea could provide, namely that
Arriaga was present in a class that ran from 6:00 p.m. to 9:00
p.m. on the evening of the incident.  This attendance sheet also
had a characteristic that made it superior to Odam Chhea in at
least one respect:  it could not be cross-examined.  Again, the
Appellate Division could have concluded that it was reasonable
for Arriaga's counsel not to interview Odam Cheea if he could
only corroborate a fact already conceded by the prosecution.

Since these are reasonable arguments that counsel satisfied
Strickland's deferential standard—both by acting in an
objectively reasonable fashion as measured by prevailing
professional norms and because any unprofessional error would
not have led to a different outcome—the state court reasonably
applied Strickland.

**2.   The State Court Did Not Unreasonably Apply Strickland to
Arriaga's Assertion that Counsel Allegedly Failed to
Independently Examine the Crime Scene**

Arriaga also asserts that his counsel's alleged failure to
independently examine the crime scene violated his Sixth
Amendment right to effective assistance of counsel.  In sum,
Arriaga argues that, had his counsel performed an independent
investigation of the crime scene, "they would have been in a
position to thoroughly impeach the testimony of Mr. Borras, who
was the State's only witness." (Br. 18.)

The state court expressly considered Arriaga's argument on
his section 440.10 motion and concluded that Arriaga's counsel
thoroughly challenged Borras' identification throughout the case
from pre-trial motions through summation.  Specifically, the
court ruled that "the witnesses' [sic] ability to observe who
shot the deceased was thoroughly questioned by [the] defense
attorney and argued during summation." (Whetstone Aff. Ex. 2, at
3.)  The court added, "a Wade hearing (actually a
Huntley/Wade/Mapp hearing) was conducted on October 24-25, 2005

24

after which Judge Farber held that the witness' identification

of defendant was not improperly suggestive." (Id.)

These are reasonable arguments that Arriaga's counsel

satisfied Strickland by singling out Borras' identification as

the linchpin of the prosecution and acting reasonably by

challenging it throughout the duration of the case.  Moreover,

it was reasonable for the state court to conclude that counsel's

independent examination of the crime scene would not have

produced a different result.  Therefore, the state court

reasonably applied Strickland.

Finally, Arriaga argues that the state court's decision was

contrary to and an unreasonable application of clearly

established law because it

> did not hold an evidentiary hearing to develop
> the record even though such a hearing was
> required by law because the facts stated in
> the pro-se [sic] CPL 440 motion, if true,
> would have entitled petitioner to a new trial.
> Second, the state court system did not
> consider the totality of the evidence without
> regard to admissibility.

(Br. 13.)  Arriaga does not identify the clearly established

federal law that he claims the state court violated by failing

to follow the state law procedures associated with a section

440.10 motion.  Indeed, this argument appears to merely claim

that the state court failed to follow the state procedures

associated with postconviction challenges.  "[I]t is not the

25

province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Accordingly, the Court declines to consider whether the state court should have held an evidentiary hearing in accordance with New York Criminal Procedure Law.

**B.  The State Court's Determination of Arriaga's Prosecutorial Misconduct Claim Was Not Contrary to or an Unreasonable Application of Cleary Established Federal Law**

Arriaga also argues that the prosecutor committed misconduct by failing to correct Borras' false testimony and by stating that another eyewitness identified Arriaga in her summation in violation of the Due Process clause.

**1.  The State Court's Decision Considering the Prosecutor's Alleged Failure to Correct False Testimony Was Not Contrary to, or an Unreasonable Application of, Napue v. Illinois, Giglio v. United States, and United States v. Agurs**

The clearly established federal law for the purposes of Arriaga's argument that the prosecution allegedly failed to correct false testimony is that the conviction must be set aside if (1) there was false testimony; (2) the prosecution actually knew of Borras' false testimony, and (3) there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Drake v. Portuondo (Drake II), 553 F.3d 230, 241 (2d Cir. 2009); accord id. at 240 (citing United States v. Agurs, 427 U.S. 97, 103 (1976); Giglio v. United States, 405

U.S. 105, 153 (1972); <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)).[2]

On his section 440.10 motion, the state court declined to decide the merits of Arriaga's prosecutorial misconduct arguments, concluding that the argument should be raised in his direct appeal. (<u>See</u> Whetstone Aff. Ex. 2, at 4 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c)); <u>Bell v. Miller</u>, 500 F.3d 149, 154-55 (2d Cir. 2007) (describing phrasing similar to the opinion here as "a contrary-to-fact construction" rather than an alternative holding and holding that such a construction is not an opinion on the merits). On direct appeal, the state court summarily rejected Arriaga's argument on the merits, stating simply that it "considered and rejected defendant's remaining pro se claims." <u>Arriaga</u>, 90 A.D.3d at 416.

---

[2] In <u>Agurs</u>, the U.S. Supreme Court identified the second element as including either the prosecutor's actual knowledge or his constructive knowledge. <u>See</u> 427 U.S. at 103 ("[T]he undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, <u>or should have known</u>, of the perjury." (emphasis added)). However, because <u>Agurs</u> involved allegations of actual knowledge (making the provision of habeas relief on proof of constructive knowledge "in the nature of dictum," <u>see</u> <u>Drake v. Protuondo</u> (<u>Drake I</u>), 321 F.3d 338, 345 (2d Cir. 2003)), the Second Circuit expressly declined to include constructive knowledge as part of the "clearly established Federal law" necessary for analysis under § 2254(d). <u>See Drake II</u>, 553 F.3d at 240; <u>see also Williams</u>, 529 U.S. at 365 ("[T]he phrase 'clearly established Federal law, as determined by [this] Court' refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." (second alteration in original)).

Arriaga argues that the prosecutor failed to correct
Borras' false testimony with regards to the shooter's position.
Specifically, Arriaga claims that Borras testified falsely,
because the evidence shows that, at the crime scene, he told
Officer DeFalco that he did not see the shooter.  Later, as
evidenced by Detective Tracy's statement, Borras allegedly
changed his story so that he observed the shooter standing at
the bottom of the staircase leading into the apartment.  And
finally, at trial, Borras testified that he instead observed the
shooter standing on the top of the stairs, and he marked
People's Exhibits 9B and 11A to illustrate the shooter's
position.  Arriaga argues that "[t]his dramatic change called
for an immediate investigation of the crime scene. . . .  If the
prosecution had conducted a reasonable investigation of the
crime scene, it would have had to correct the false testimony of
Mr. Borras, who could not have witnessed the shooting." (Br.
19.)

Arriaga fails to show that Borras testified falsely.  "A
witness commits perjury if he gives false testimony concerning a
material matter with the willful intent to provide false
testimony, as distinguished from incorrect testimony resulting
from confusion, mistake, or faulty memory." United States v.
Monteleone, 257 F.3d 210, 219 (2d Cir. 2001) (citing United
States v. Dunningan, 507 U.S. 87, 94 (1993)); cf. N.Y. Penal Law

§ 210.00(5) (defining "swears falsely" as "when [a person] intentionally makes a false statement which he does not believe to be true . . . while giving testimony"). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." Monteleone, 257 F.3d at 219.  Here, Arriaga fails to identify any fatal inconsistencies in Borras' testimony. Rather, Arriaga points to two prior inconsistent statements that came out at trial.  "A prior inconsistent statement does not rise to the level of perjury." Smithwick v. Walker, 758 F. Supp. 178, 186 (S.D.N.Y. 1991).  Rather, a prior inconsistent statement presents the defense counsel with an opportunity to impeach the witness and, ultimately, the jury with a credibility determination to make.  Unsurprisingly, Borras' prior inconsistent statements were explored at trial.  The defense called Detective Tracy as a witness, and he explained that witnesses are usually reluctant to share information at the crime scene so he typically conducts interviews at the precinct house.  With regards to Tracy's statement from the precinct house interview, Borras explained that Detective Tracy's statement referencing the bottom of the stairs must have been an error in transcription by the detective, and Detective Tracy himself described the statement as merely a "loose translation" of Borras' statements during the interview.

29

The state court could have reasoned that Borras' testimony and his prior inconsistent statements did not demonstrate that Borras testified falsely, and thus, that the prosecutor did not suborn false testimony at all.  Because this reasoning is not inconsistent with a prior decision of the U.S. Supreme Court, the state court's decision is not an unreasonable application of clearly established federal law.

### 2.  The State Court's Determination That Arriaga's Claim of Prosecutorial Misconduct Was Unpreserved Is an Independent and Adequate State Ground to Bar Federal Review

On his section 440.10 motion, the state court rejected Arriaga's prosecutorial misconduct claim under state law because sufficient facts existed in the record to raise it on direct appeal. (See Whetston Aff. Ex. 2, at 4 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c)).)  On direct appeal, the Appellate Division rejected Arriaga's prosecutorial misconduct claim as unpreserved. See Arriaga, 90 A.D.3d at 416 (citing People v. Romero, 7 N.Y.3d 911 (2006).  "As an alternative holding, [the Appellate Division] f[ou]nd no basis for reversal." Id. (citing People v. D'Alessandro, 184 A.D.2d 114, 118-19 (1st Dep't 1992)).

A state procedural bar can be an independent and adequate state ground that forecloses federal habeas review to a petitioner.  This is so even when a state court makes an alternative finding on the merits. See Harris v. Reed, 489 U.S.

30

255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an <u>alternative</u> holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); <u>Glenn v. Bartlett</u>, 98 F.3d 721, 724 (2d Cir. 1996).

The federal habeas court makes the determination whether a state ground for decision is independent and adequate by "assess[ing] the adequacy of a state ground of decision by examining whether the rule upon which the state court relied is firmly established and regularly followed." <u>Fulton v. Graham</u>, 802 F.3d 257, 262 (2d Cir. 2015) (quoting <u>Downs v. Lape</u>, 657 F.3d 97, 102 (2d Cir. 2011)).  "In exceptional cases, however, the 'exorbitant application of a generally sound rule renders the state ground inadequate' and will not prevent a federal court's consideration of the federal question presented." <u>Id.</u> (quoting <u>Lee v. Kemna</u>, 534 U.S 362, 376 (2002)).  To determine whether a case involving an independent and adequate state ground is exceptional, the court looks to the following nonexclusive factors as guideposts in evaluating the state interest in a procedural rule against the circumstances of a particular case:

> (1)  whether the alleged procedural violation
> was actually relied on in the trial court, and
> whether perfect compliance with the state rule
> would have changed the trial court's decision;
>
> (2)  whether state caselaw indicated that
> compliance with the rule was demanded in the
> specific circumstances presented; and
>
> (3)  whether petitioner had substantially
> complied with the rule . . . and therefore,
> whether demanding perfect compliance with the
> rule would serve a legitimate governmental
> interest.

Id. (alteration in original) (quoting Cotto v. Herbert, 331 F.3d
217, 240 (2d Cir. 2003)).  These guideposts were first
articulated in the U.S. Supreme Court's opinion in Lee, 534 U.S.
at 381-85.

The procedural bar applied by the state court in this case
was a firmly established and regularly followed rule and, as
such, it prevents this Court from reviewing the federal question
presented.

During her summation, the prosecutor made reference to a
second witness, stating, "We know through Kevin Tracy that
they're relying on the description that someone else has
provided." (Trial Tr. 896, Nov. 16, 2005 (People's summation).)
Arriaga's counsel made a one-word objection, which the state
trial court sustained and instructed the jury to disregard the
prosecutor's statement. (Id.)  The prosecution attempted to
rephrase the description twice more, defense counsel lodged the

32

same one-word objection, and the court sustained these objections, finally admonishing the prosecutor that if she "say[s] it one more time, [she's] sitting down." (<u>Id.</u> at 896-897.)  At the close of the prosecution's summation, Arriaga's counsel moved for a mistrial, which the court denied. (<u>Id.</u> at 931-945 (proceedings).)  Arriaga's counsel also requested a curative instruction addressing the prosecutor's statements with regards to the second witness. (<u>Id.</u> at 934, 940-945.)  The court provided the curative instruction. (<u>Id.</u> at 947.)  After the court's curative instruction, Arriaga's counsel lodged no further objection and did not renew its motion for mistrial.

In New York, when a court sustains a general objection and provides a curative instruction to the jury, the curative instruction is deemed acceptable to the defendant and the issue is unpreserved on appeal absent a renewed objection or motion for mistrial. <u>See, e.g.</u>, <u>People v. Heide</u>, 84 N.Y.2d 943, 944 (1994) ("Defendant's claim that certain remarks made by the prosecutor during summation were so prejudicial as to deprive him of a fair trial is unpreserved for [the Court of Appeal]'s review.  Following the Trial Judge's curative instructions, defense counsel neither objected further, nor requested a mistrial.  Under these circumstances, the curative instructions must be deemed to have corrected the error to the defendant's satisfaction."); <u>People v. Williams</u>, 46 N.Y.2d 1070, 1071 (1979)

("Though the prosecutor's summation comment suggesting that the defendant may have engaged in other criminal conduct was prejudicial in nature, the Trial Judge's lucid curative instructions to the jury, following which neither any further objection nor any request for a mistrial was made, must be deemed to have corrected the error to the defendant's satisfaction"); People v. Mirabal, 136 A.D.3d 415, 415 (1st Dep't 2016) ("Since defendant expressed complete satisfaction with the court's curative instruction and requested no further remedy, he failed to preserve his challenge to the prosecutor's summation").

Consideration of the Lee guideposts does not suggest that the state court's application of the procedural bar here needs further action.  First, the lack of a subsequent objection "would not, almost by definition, be mentioned by the trial court." Cotto, 331 F.3d at 242.  This limits the amount that this factor could weigh in favor of Arriaga.  See id.  Moreover, the trial court sustained Arriaga's counsel's original objection, granted the request to provide a curative instruction, and discussed the verbiage used in that instruction with counsel at length. (See Trial Tr. 940-945, Nov. 16, 2005 (proceedings).)  The trial court's conduct suggests that had Arriaga's counsel objected to the contents of the curative instruction even after discussing its contents with the court,

the trial court may well have acted to address the objection.
Second, as noted above, state case law clearly indicated that
compliance with the rule was demanded by the specific
circumstances presented.  Multiple opinions from the New York
Court of Appeals and Appellate Division state that a defendant
who fails to renew his objection or motion for mistrial after a
court provides a curative instruction in response to a sustained
general objection fails to preserve the objection for appeal,
because he is deemed to have accepted the curative instruction
as satisfactory. See, e.g., Heide, 84 N.Y.2d at 944; Williams,
46 N.Y. 2d at 1071; Mirabal, 136 A.D.3d at 415.  Third, Arriaga
did not substantially comply with the rule.  The record
indicates that after discussing with the trial court the
appropriate verbiage for the curative instruction, which the
trial court delivered verbatim, Arriaga lodged no further
objection or motion for mistrial.  Accordingly, all of the Lee
guideposts point in the direction that the state court's
application of the procedural bar in the specific circumstances
presented was firmly established and regularly applied.
Finally, the Court is mindful that "the principles of comity
that drive the [independent and adequate state grounds] doctrine
counsel that a federal court that deems a state procedural rule
inadequate should not reach that conclusion lightly or without

clear support in state law." <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks omitted).

Arriaga's prosecutorial misconduct claim based on the prosecutor's statements in summation is therefore barred because the state court relied on an independent and adequate state ground.

## C.  Arriaga Has Not Established Cause and Prejudice or a Gateway Claim of Actual Innocence

To overcome a procedural default, a petitioner must either establish cause for the default and prejudice attributed thereto or demonstrate that the failure to consider the federal claim will result in a fundamental miscarriage of justice. <u>Harris</u>, 489 U.S. at 262.

Arriaga does not assert cause and prejudice and the record reveals none.  Arriaga does, however, assert a gateway claim of actual innocence.  A gateway claim of actual innocence is a procedural mechanism that a prisoner uses to overcome a procedural bar to his assertion of distinct constitutional violations. <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 315-16 (1995). "[A] petitioner seeking access to a federal habeas court in the face of a procedural obstacle must advance <u>both</u> a legitimate constitutional claim <u>and</u> a credible and compelling claim of actual innocence." <u>Rivas v. Fischer</u> (<u>Rivas I</u>), 687 F.3d 514, 540 (2d Cir. 2012).

The gateway claim for actual innocence articulated by the Supreme Court in Schlup "is somewhat cryptic." Id. at 541.  To satisfy the Schlup standard, a petitioner's gateway claim of actual innocence must be both "credible" and "compelling." Id. A "credible" claim is one supported by "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324.  A "compelling" claim is one where it is "more likely than not any reasonable juror would have reasonable doubt" as to the petitioner's guilt. Rivas I, 687 F.3d at 541 (quoting House v. Bell, 547 U.S. 518, 538 (2006)).

A court deciding a gateway claim of actual innocence "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House, 547 U.S. at 538 (internal quotation marks omitted).  Nevertheless, "the Schlup standard is demanding.  The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" McQuiggin v. Perkins, --- U.S. ----, 133 S. Ct. 1924, 1936 (2013) (quoting Schlup, 513 U.S. at 316).

Arriaga submits two exhibits that he asserts are new reliable evidence that was not presented at trial that proves more likely than not any reasonable juror would have a reasonable doubt as to his guilt.

The first exhibit is an October 11, 2012 "Investigation Report" from Epic Security Corp., a private investigation firm. (See Br. Ex. A.)  This report states that Selwyn Falk, a licensed private investigator conducted a "crime scene (walk-through) re-enactment video" of the basement apartment at 592 Morris Park Avenue. (Id. at 1-2.)  Although two "significant" alterations were made to the apartment since the date of Wenner's murder—namely, the addition of a metal canopy extending 3 feet over the entryway and an extension of the bedroom walls to a point that covered where Borras testified he stood—the report concludes that

> based on measurements and markings from the
> Crime Scene Unit Supplementary Report, Page 2
> of 2, CSU Run # 03/0587[,] which show[s] an
> illustration of the basement apartment plan
> [and] the noted location of the witness
> Emmanuel Borras when he claims to have
> witnessed the shooting . . . it is the opinion
> of this investigator and of the assistants
> involved in the making of the video that[,] if
> the witness Emmanuel Borras was positioned at
> the location indicated, the witness could not
> have seen the perpetrator of the shooting
> because when looking from the inside of the
> apartment out towards the exterior staircase
> leading down to the yard area where the
> basement apartment front door is located,
> there is a wall positioned to the left of the

> doorway that would have completely obstructed
> any view of the shooter standing on the
> exterior steps . . . .

(Id. at 2.)

The second exhibit is an unsworn single page "affidavit" from Arriaga's mother, Miriam Casillas.  Casillas states that she contacted Odam Chhea via the website "Linked" on November 18, 2009, and that sometime later,[3] Mr. Chhea called her at work and was able to describe to her what her son looked like. (Id. Ex. B ¶¶ 4-5.)  Casillas also states that Mr. Chhea claimed that "he never spoke to or met anyone in [regards] to [Arriaga] being arrested." (Id. Ex. B ¶ 6.)

The evidence that Arriaga submits is not credible because it is not new reliable evidence.  This Court has previously observed on several occasions that the Second Circuit has not yet defined the contours of "new" evidence under Schlup. See Read v. Thompson, No. 13 Civ. 3661, 2016 WL 165716, at *7 (S.D.N.Y. Jan. 13, 2016) (citing Bowman v. Racette, No. 12 Civ. 4153, 2015 WL 1780159, at *3 (S.D.N.Y. Apr. 20, 2015) ("[T]he definition of 'new' evidence under the Schlup standard appears to be an open question in this Circuit."); Tuitt v. Martuscello, No. 12 Civ. 1003, 2013 WL 55083585, at *15 n.16 (S.D.N.Y. Oct.

---

[3]  Ms. Casillas' statement later refers to the conversation as occurring on November 8, 2009. (Br. Ex. B. ¶ 7.)  This would appear to be a typographical error.

3, 2013) (Davidson, Mag. J.) (same), adopted by 2013 WL
55083585, at *1-5.). This Court is not without guidance,
however. In McQuiggin, the Supreme Court endorsed a district
court opinion that determined that characterizing evidence
consisting of information "substantially available to [the
petitioner] at trial" as new was "dubious." 133 S. Ct. at 1930,
36. Arriaga presents similar evidence here. While the
"Investigation Report" and Ms. Casillas' statement are "new" in
the sense that they were not available to Arriaga at trial, the
information contained in them was. As noted by the state court
on Arriaga's section 440.10 motion—and as is clear from the
trial record—Borras' "ability to observe who shot the deceased
was thoroughly questioned by [the] defense attorney and argued
during summation." (Whetstone Aff. Ex. 2, at 3.) Additionally,
Arriaga entered into evidence the attendance sheet from his
class showing that he was present in class on the date of
Wenner's murder. The two exhibits that Arriaga submits are not
"new," because they are simply later recasting of evidence
available to and presented by Arriaga at the time of trial.[4]

Even if Arriaga's evidence were "new," it is not compelling
because it does not demonstrate that it is more likely than not

---

[4] To the extent that Arriaga intends Casillas' statement to
support his ineffective assistance of counsel claim, the record
on his § 2254 motion is limited to that presented to the state
court. See Cullen, 563 U.S. at 185.

any reasonable juror would have reasonable doubt about Arriaga's
guilt if it had been presented to the jury.  The two exhibits
are weaker echoes of evidence that Arriaga presented to the jury
and that the jury rejected in favor of the evidence presented
against him.  Nothing in the "Investigation Report" or Casillas'
statement can be said to be evidence of innocence so strong to
open the Schlup gateway.  Consequently, the evidence submitted
with Arriaga's § 2254 motion does not establish a gateway claim
of actual innocence and, thus, fails to overcome the procedural
bar that forecloses Arriaga's substantive argument of
prosecutorial misconduct with regards to the prosecution's
summation.

### D.  The State Court's Determination of the Sufficiency of the Evidence of Arriaga's Conviction Was Not Contrary to or an Unreasonable Application of Jackson v. Virginia

The clearly established federal law for the purposes of
Arriaga's insufficiency of the evidence argument is Jackson v.
Virginia, 443 U.S. 307 (1979).  The Jackson standard requires a
reviewing court to determine "whether, after viewing the
evidence in the light most favorable to the prosecution, any
rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt." Id. at 319.  A federal
habeas court's review of a state court's Jackson analysis is
"twice deferential":  a federal habeas court "may not overturn
the state-court decision rejecting a sufficiency challenge

41

unless the decision was objectively unreasonable." Santone v.
Fischer, 689 F.3d 138, 148 (2d Cir. 2012) (alterations omitted)
(internal quotation marks omitted) (quoting Parker v. Matthews,
--- U.S. ----, 132 S. Ct. 2148, 2152 (2012)).  In other words,
when a federal habeas court is "faced with a record of
historical facts that supports conflicting inferences[, it] must
presume—even if it does not affirmatively appear in the record—
that the trier of fact resolved any such conflicts in favor of
the prosecution, and must defer to that resolution." McDaniel v.
Brown, 558 U.S. 120, 133 (2010) (quoting Jackson, 433 U.S. at
326).

Arriaga argues that the evidence was insufficient to
convict him because Borras' testimony "was so contradictory that
it cannot be the basis for conviction beyond a reasonable doubt"
and that Borras' testimony was physically impossible. (Br. 26.)
Arriaga fails to show that the state court's determination that
any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt was objectively
unreasonable.

A federal habeas court reviewing a state court's
determination of the sufficiency of the evidence first
identifies the elements of the offense as defined by state law.
See Coleman v. Johnson, --- U.S. ----, 132 S. Ct. 2060, 2064
(2012); Gutierrez v. Smith, 702 F.3d 103, 113 (2d Cir. 2012).

Under N.Y. Penal Law § 125.25[1], an individual commits murder in the second degree when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." A jury may infer intent from the act itself or from the defendant's conduct and the surrounding circumstances. See People v. Smith, 79 N.Y.2d 309, 315 (1992); People v. Bracey, 41 N.Y.2d 296, 301 (1977).

Taken in the light most favorable to the prosecution, Borras' testimony revealed that he saw Arriaga twice on the day of Wenner's murder prior to the actual killing:  first, when Arriaga stared Wenner down outside of Wenner's apartment and, again, when Wenner approached Arriaga and asked if he had a problem.  At the end of that confrontation, Arriaga informed Wenner that he "would be back."  Arriaga returned that evening and opened fire on Wenner while he was bringing chairs into his apartment from outside.  Borras, who was playing video games at the time, stood up, looked over Wenner's shoulder and saw Arriaga standing at the top of the stairs.  Wenner shouted to Borras, "He came back, he is shooting at me."  Borras and Wenner then ran into Wenner's son's bedroom to ensure that Wenner's son was safe, before Wenner confronted Arriaga, and Arriaga shot and killed Wenner.

Arriaga challenges Borras' testimony as inconsistent and incredible as a matter of law.  With regards to consistency, as

43

noted above, Arriaga fails to point out any fatal inconsistency in Borras' testimony.  At best, Arriaga identifies two prior inconsistent statements made by Borras that were explored at trial.  The law is that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction' and . . . such a principle has deep roots in our system of justice." United States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004) (quoting United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)) (citing Weiler v. United States, 323 U.S. 606, 608 (1945); 7 John Henry Wigmore, Evidence § 2034 (Chadbourn rev. ed. 1978)).  This is true even when the eyewitnesses testimony is "less than inspiring" because of its consistency. Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983).  The determination of Borras' ultimate credibility in light of his testimony and his prior inconsistent statements rests with the jury and this Court may not substitute its judgment on credibility unless the jury's finding is "so unsupportable as to fall below the threshold of bare rationality." Coleman, 132 S. Ct. at 2065.  That is not the case here.  Borras was before the jury, not me.

Similarly, Arriaga did not establish that Borras' testimony was incredible as a matter of law.  Credibility determinations are exclusively the province of the jury, see Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996), and will be invaded on

collateral attack only when a witness' testimony is "so
incredible that no reasonable juror could believe him." United
States v. Shulman, 624 F.2d 384, 388 (2d Cir. 1980); accord
United States v. Rodriguez, 702 F.2d 38, 43 (2d Cir. 1983).
Arriaga argues that it was physically impossible for Borras to
see a shooter from the top of the stairs from where he stood
within the apartment.  This argument was thoroughly explored by
Arriaga's defense counsel and put before the jury.  The jury was
in the best position to determine whether Borras' description of
his position and the position of the shooter made it possible
for him to see the shooter and identify Arriaga. See Banks v.
People, No. 94 Civ. 555 (DLC), 1994 WL 661100 (S.D.N.Y. Nov. 22,
1994) (rejecting a sufficiency of evidence claim where "the jury
was well able to judge whether the descriptions given by the
plaintiff of her clothing and [of] her and the defendant's
positions made penetration a physical impossibility").  The
jury's determination does not fall below the threshold of bare
rationality and, therefore, the state court did not unreasonably
apply the Jackson standard.

## Conclusion

The Court has considered all of Arriaga's arguments and has
determined that they are without merit.  Arriaga's application
for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is

denied.  The Clerk is respectfully directed to close the case
and enter judgment for the respondents.

Arriaga has not made a substantial showing of the denial of
a constitutional right and, therefore, a certificate of
appealability shall not issue. See 28 U.S.C. § 2253(c).

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3),
that any appeal from this Order would not be taken in good
faith, and therefore in forma pauperis status is denied for the
purpose of an appeal. See Coppedge v. United States, 369 U.S.
438, 444-45 (1962).

**SO ORDERED.**

Dated:      July 11, 2016
            New York, New York

John F. Keenan
United States District Judge